IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:17-CV-295-FL

| | | |
|---|---|---|
| ELENA COLEMAN, on behalf of minor child N.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | ORDER |
| WAKE COUNTY BOARD OF EDUCATION, and WAKE COUNTY PUBLIC SCHOOL SYSTEM, | ) ) ) ) | |
| Defendants. | ) | |

This matter comes before the court on defendants' motion for judgment on the administrative record (DE 78), defendants' corrected motion for summary judgment (DE 88), and plaintiff's motion to strike (DE 93). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendants' motion for judgment on the administrative record is granted, defendants' corrected motion for summary judgment is granted, and plaintiff's motion to strike is denied.

## STATEMENT OF THE CASE

Plaintiff and N.C.'s father (collectively "parents") initially filed a petition for contested case under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq., on October 3, 2014, when N.C. was in third grade at Root Elementary School. On November 4, 2014, N.C.'s parents filed a 37-page addendum to the October 2014 petition, with additional claims and

requested remedies. N.C.'s parents voluntarily dismissed the October 2014 petition on January 15, 2015.

Several months later, N.C.'s parents filed another petition for contested hearing on January 14, 2016, after N.C. had completed third grade and had withdrawn from Wake County Public Schools. N.C.'s parents incorporated the October 2014 petition and addendum and raised new claims regarding the provision of a free appropriate public education to N.C. through the end of the 2014–15 school year. While the January 2016 petition was pending, N.C.'s parents filed another petition on May 23, 2016, claiming that defendants failed to provide them with copies of a document generated by John Thomas ("Thomas"), an independent behavioral expert who observed N.C. at school in March 2014.

An administrative hearing was held on the January 2016 and May 2016 petitions over eleven days from August to October 2016. Both parties were represented by counsel at the hearing. Seventeen witnesses testified, and extensive exhibits were received into the record. After hearing, the administrative law judge ("ALJ") held that defendants had provided N.C. with a free appropriate public education ("FAPE") during the relevant time period. N.C.'s parents appealed the decision to a State Hearing Review Officer ("SHRO"), who reviewed the record and held for defendants on all issues.

Plaintiff, proceeding pro se, commenced this action on June 16, 2017. After receiving leave to proceed in forma pauperis, plaintiff filed an amended complaint on September 1, 2017, and second amended complaint with leave of court on March 30, 2018. Plaintiff alleges that defendants failed to reasonably calculate and implement N.C.'s individualized education program ("IEP"), thereby denying him a FAPE. Plaintiff also alleges defendants committed a procedural violation of the IDEA by failing to provide copies of Thomas's observation of N.C. at school and

accompanying recommendations. Finally, plaintiff alleges retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12203, and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. 794(d). Plaintiff seeks damages, an order requiring defendants to provide compensatory education to N.C., and an injunction nullifying the no-trespass letter issued by defendants prohibiting her from coming on to any Wake County Public Schools property.

On September 19, 2018, and November 6, 2018, defendants filed portions of the administrative record of state proceedings. The court finally settled the administrative record for the instant IDEA claims in this case on March 21, 2019. (Order (DE 74)). The record includes evidence lodged at docket entries 49, 50, 55, 56, 67, and manual filing of certain audio recordings noticed at docket entry 68. (See Order (DE 74) at 3).

After a contentious period of discovery, defendants filed their instant motions for judgment on the administrative record and motion for summary judgment. In support of their motion for summary judgment on plaintiff's retaliation claims, defendants rely upon the administrative record, the documents attached to the pleadings, testimony of Russ Smith ("Smith"), defendant Wake County Board of Education's senior director of security; Kimberly Grant ("Grant"), principal of Lynn Road Elementary School from July 1, 2013, to April 1, 2017; and a findings letter from the United States Department of Education Office for Civil Rights ("OCR").

After defendants filed their respective dispositive motions, plaintiff did not file a response in opposition to defendants' motion for judgment on the administrative record. Plaintiff filed the instant motion to strike defendants' corrected motion for summary judgment, arguing that defendants' corrected motion does not comply with the court's rules. Plaintiff also filed her

response in opposition to defendants' motion for summary judgment, relying upon voluminous

documents and testimony pertaining to N.C.'s IDEA state administrative proceedings.[1]

## COURT'S DISCUSSION

A.      Defendants' Motion for Judgment on the Administrative Record (DE 78)

1.      Standard of Review

North Carolina law provides a two-tiered administrative review process of IDEA claims.

See E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 515 (4th Cir. 2014).

First, an ALJ conducts an evidentiary hearing and renders a decision.  N.C. Gen. Stat. § 115C-

109.6.  A party may appeal the ALJ's decision to the State Board of Education, prompting review

by a SHRO.  N.C. Gen. Stat. § 115C-109.9.  After exhausting these administrative remedies, an

aggrieved party[2] may file a civil action in federal court.  20 U.S.C. § 1415(i)(2)(A).  Thereafter,

the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional

evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence,

shall grant such relief as the court determines is appropriate."  Id. § 1415(i)(2)(C).  The burden of

---

[1]      For the IDEA claims in this case, motions to consider additional evidence outside the administrative record were due 30 days after the administrative record was settled.  (Order (DE 47) at 1).  Where the administrative record was settled on March 21, 2019, any supplemental motions by plaintiff for consideration of additional evidence should have been filed by April 22, 2019.  See Fed. R. Civ. P. 6(a)(1)(C).  The documents proffered by plaintiff in opposition to summary judgment were not filed until November 4, 2019.  Plaintiff has failed to demonstrate good cause why this evidence was not submitted with appropriate motion to the court by April 22, 2019.  Therefore, the court does not consider plaintiff's evidence for purposes of motion for judgment on the administrative record.

[2]      "[N]on-attorney parents generally may not litigate the claims of their minor children in federal court."  Myers v. Loudoun Cty. Pub. Sch., 418 F.3d 395, 401 (4th Cir. 2005) (collecting cases).  However, the United States Supreme Court has held the "IDEA grants parents independent, enforceable rights. These rights, which are not limited to certain procedural and reimbursement-related matters, encompass the entitlement to a free appropriate public education for the parents' child."  Winkelman ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 533 (2007).  "Therefore, [p]arents enjoy rights under IDEA; and they are, as a result, entitled to prosecute IDEA claims on their own behalf."  Id. at 535 (abrogating Doe v. Bd. of Educ. of Baltimore Cty., 165 F.3d 260, 263 (4th Cir. 1998) (holding that "the child, not the parents, is the real party in interest in any IDEA proceeding")); see 28 U.S.C. § 1654.  Accordingly, the court reaches the merits of plaintiff's claims.

proof rests with plaintiff.  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56–58 (2005); Barnett by Barnett v. Fairfax Cty. Sch. Bd., 927 F.2d 146, 152 (4th Cir. 1991).

"[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 206 (1982).  "The district court must give 'due weight' to the administrative proceedings, but the findings of fact and ultimate decision as to whether the state has complied with the IDEA are made by the district court." Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH, 642 F.3d 478, 484 (4th Cir. 2011) (quoting Doyle v. Arlington County Sch. Bd., 953 F.2d 100, 103 (4th Cir. 1991)).  "Due weight" means "findings of fact by the hearing officers in cases such as these are entitled to be considered prima facie correct, akin to the traditional sense of permitting a result to be based on such fact-finding, but not requiring it." Doyle, 953 F.2d at 105; see also Cty. Sch. Bd. of Henrico Cty., Virginia v. Z.P. ex rel. R.P., 399 F.3d 298, 305 (4th Cir. 2005) (holding factual findings are entitled to a presumption of correctness, so long as the findings were "regularly made").  Determinations of law are reviewed de novo.  See A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 679–80 (4th Cir. 2007).

    2.    Statute of Limitations

Before turning to the analysis of plaintiff's IDEA claims, the court first addresses a threshold legal question: what statute of limitations applies to plaintiff's claims.  See C.M. ex rel. J.M. v. Bd. of Educ. of Henderson Cty., 241 F.3d 374, 384 (4th Cir. 2001) (reviewing applicability of the administrative statute of limitations de novo).  Specifically, the court considers whether and to what extent plaintiff's petitions filed on January 14, 2016, and on May 23, 2016 are time-barred.

"A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows." 20 U.S.C. § 1415(f)(3)(C). North Carolina law in turn requires that, "notwithstanding any other law," a petition for due process hearing "set[] forth an alleged violation that occurred not more than one year before the party knew or reasonably should have known about the alleged action that forms the basis of the petition." N.C. Gen. Stat. § 115C-109.6(b). The one-year statute of limitations "strikes an appropriate balance between the need for speedy resolution of disputes and the need to ensure that parties have a fair opportunity to obtain judicial review of administrative due process proceedings." Manning ex rel. Manning v. Fairfax Cty. Sch. Bd., 176 F.3d 235, 239 (4th Cir. 1999).

The limitations period for filing a petition for contested hearing is extended in two limited circumstances:

> if the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the petition, or (ii) the local educational agency's withholding of information from the parent that was required under State or federal law to be provided to the parent.

Id. § 115C-109.6(c); see 20 U.S.C. §§ 1415(b)(6)(B), (f)(3)(D) (mandating such exceptions be allowed under state law).

In the administrative proceedings below, the ALJ and the SHRO disagreed as to the applicability of the "savings clause" for voluntary dismissals under the North Carolina Rules of Civil Procedure in the administrative proceeding below. In pertinent part, the rule provides "[i]f an action commenced within the time prescribed therefor, or any claim therein, is dismissed without prejudice under this subsection, a new action based on the same claim may be commenced within one year after such dismissal." N.C. Gen. Stat. § 1A-1, Rule 41(a)(1).

"The process of construing a statutory provision must begin with an examination of the relevant statutory language." Wilkie v. City of Boiling Spring Lakes, 370 N.C. 540, 547 (2018). "A notwithstanding clause identifies a potential conflict between two or more provisions and specifies which provision will prevail." N.L.R.B. v. SW Gen., Inc., 137 S. Ct. 929, 950 (2017). Moreover, "[u]nder the doctrine of expressio unius est exclusio alterius, when a statute lists the situations to which it applies, it implies the exclusion of situations not contained in the list." Cooper v. Berger, 371 N.C. 799, 810 (2018) (internal citations omitted).

Reading § 115C-109.6 in its entirety, the "notwithstanding" provision in subsection (b) eliminates the applicability of any other state law to the one-year statute of limitations for administrative claims. Thereafter, subsection (c) enumerates specific statutory exceptions to the one-year limitations period set forth in subsection (b). Applying basic principles of statutory interpretation, § 115C-109.6 eliminates tolling exceptions otherwise provided under state law, such as the savings clause, and enumerates limited exceptions to the one-year statute of limitations consistent with those provided under federal law. See D.K. v. Abington Sch. Dist., 696 F.3d 233, 248 (3d Cir. 2012) (internal citations omitted) ("[T]he legislative and regulatory history of the 2004 amendments to the IDEA makes clear that only the enumerated statutory exceptions may exempt a plaintiff from having [her] claims time-barred by the statute of limitations.").

Applying § 115C-109.6 to the instant case, the statute of limitations for plaintiff's January 14, 2016, petition for administrative hearing extends back to occurrences on or after January 14, 2015. The petition purported to "incorporate by reference all facts, allegations, requested resolution or remedies, and any other information contained in" the October 3, 2014 petition and accompanying addendum filed November 4, 2014. (See R. (DE 50-4) at 2, 20).[3] Plainly, all of

---

[3] Where the administrative record consists of several thousand pages of documents filed multiple docket entries. For consistency and clarity, the court cites the settled administrative record, including additional evidence

the issues raised in the October 2014 petition and accompanying addendum were within plaintiff's knowledge prior to January 14, 2015, and plaintiff was not prevented from having her claims heard at the time those claims were originally filed. Likewise, plaintiff's January 14, 2016, petition indicates plaintiff knew or reasonably should have known of the "additional allegations" of events from October 2014 to January 13, 2015. (See R. (DE 50-4) at 6–8). Therefore, plaintiff's IDEA claims from her January 14, 2016, petition are time-barred except for claims arising on or after January 14, 2015.

Plaintiff's May 23, 2016, petition raises a discrete issue: whether defendants withholding the Thomas report, a report observing N.C. and making recommendations regarding his behavioral program, substantively violated the IDEA. (See R. (DE 67-1) at 26). The Thomas report was sent to defendants on or about March 30, 2014, and not disclosed to plaintiff at an IEP meeting on May 10, 2014. (R. (DE 50-3) at 281). However, plaintiff only discovered the full three-page report after filing the January 14, 2016, petition. (See R. (DE 50-3) at 295). Therefore, defendants' withholding of the full Thomas report extends the statute of limitations as to the May 23, 2016, petition for hearing. See N.C. Gen. Stat. § 115C-109.6(c)(ii). Plaintiff's claims arising from the failure to provide the Thomas report are timely.[4]

    3.      Analysis

        a.      Background

---

admitted on motion of the parties, as "R.," followed by the docket entry number. Page numbers are those assigned by the court's case management and electronic case filing system ("CM/ECF").

[4]      The court does not consider any other claims accruing prior to January 14, 2015, as those claims do not fall within the statutory exception. The court only applies § 115C-109.6(c)(ii) for the limited purpose of considering the full Thomas report, which defendants withheld from plaintiff. The ALJ and SHRO's decisions otherwise misapplied the statute of limitations in the instant case to claims older than one year and outside the statutory exceptions.

N.C. is a minor diagnosed with Autism Spectrum Disorder and a mild intellectual disability. (R. (DE 50-1) at 5–7). As part of his disability, N.C. has difficulty with transitions and changes in his routine, social interactions, and behavioral and emotional regulation. (R. (DE 49-1) at 434, 446–47; R. (DE 49-2) at 609–11, 737–38, 872–73; R. (DE 49-3) at 317–18). N.C. also develops fixations or special interest in objects, which can interfere with his instruction or promote maladaptive behaviors. (R. (DE 49-1) at 41, 547). As is common for students with autism, N.C. also experiences anxiety, especially regarding transitions and academic demands.[5] (R. (DE 49-1) at 42, 587–88, 610–11, 617; R. (DE 49-2) at 603–04, 609; R. (DE 49-3) at 229).

N.C. attended Lynn Road Elementary School, a Wake County elementary school, for the 2013–14 school year. (R. (DE 50-4) at 180). N.C. attended Root Elementary School, a Wake County elementary school, for the 2014–15 school year. (R. (DE 50-4) at 180). Prior to the start of the 2015–16 school year, N.C.'s parents withdrew N.C. from Wake County Public Schools and enrolled him in a public charter school. (R. (DE 50-4) at 180). Plaintiff was very involved in all of N.C.'s IEP meetings and provided extensive feedback to school staff. (See R. (DE 50-3) at 311 (citing numerous exhibits evincing parental participation)). IEP meetings were lengthy; they also tended to be contentious and emotional, with plaintiff talking very loudly, interrupting others, and arguing over miniscule things for hours. (See, e.g., R. (DE 49-1) at 214, 235, 251, 393–94).

b.    Thomas Report

In March 2014, with plaintiff's consent, defendants contracted Thomas to observe N.C. at Lynn Road Elementary School on March 27, 2014, review N.C.'s existing behavioral plan, and suggest any possible adjustments. (R. (DE 49-1) at 402, 405, 423–24). Prior to and during his visit, Thomas reviewed academic and behavioral data, observed N.C., and reviewed N.C.'s special

---

[5]    The record does not, as plaintiff suggests, demonstrate that N.C. has been diagnosed with generalized anxiety disorder. (See R. (DE 49-1) at 615; R. (DE 50-2) at 254–63; R. (DE 55-5) at 36).

education file. (Tr. (DE 49-1) at 423). Following his observation, Thomas drafted a three-page, single spaced report describing his observations and making recommendations. (R. (DE 49-1) at 409; R. (DE 56-10) at 28–30).

After Thomas sent his report to Melvin Diggs ("Diggs"), a senior administrator in the Special Education Services Department, on March 30, 2014, Diggs asked Thomas to provide a condensed version of the report. (R. (DE 49-1) at 429, 455; R. (DE 49-3) at 154; R. (DE 56-10) at 27). According to Diggs, the goal of creating the condensed version of the report was to facilitate discussion of recommendations, not change the content. (R. (DE 49-1) at 455; R. (DE 49-3) at 159, 450). The summary of recommendations provided in the condensed report was substantially similar to the recommendations in the full report. (R. (DE 49-1) at 433–34; R. (DE 56-10) at 27–30).

When plaintiff asked Diggs for the full Thomas report, Diggs replied on April 16, 2014, that she was "provided the report with the recommendations." (R. (DE 55-5) at 30). Prior to the IEP meeting held on May 10, 2014, (see R. (DE 50-1) at 121), a "pre-IEP meeting" was held with school staff, where Diggs provided the full Thomas report to all eight school IEP team members. (R. (DE 49-3) at 162–63, 175). Plaintiff was not invited to the pre-IEP meeting and she was not given the full Thomas report at the IEP meeting. (R. (DE 49-3) at 167, 176). Defendants concede that failure to provide the full Thomas report was a procedural violation of the IDEA. (R. (DE 49-3) at 498–99).

Many of the recommended strategies, including use of social stories, a schedule, choices, practice time, and use of graphic organizers, were already incorporated into N.C.'s IEP and Behavioral Intervention Plan ("BIP") at the time Thomas observed N.C. (R. (DE 49-1) at 448; R. (DE 49-2) at 636; R. (DE 49-3) at 357–58). Additional recommendations that he made were

generally accepted and incorporated by the IEP team. (R. (DE 49-1) at 451–52, 734–36; R. (DE 49-2) at 637–39; R. (DE 49-3) at 63, 359–61). However, defendants did not accept Thomas's recommendation to implement a crisis plan, because felt that the term "crisis" did not describe N.C.'s behavior, and strategies for responding to N.C.'s raised voice or refusal were already contained in his BIP. (R. (DE 49-2) at 639; R. (DE 49-3) at 361). Both the ALJ and SHRO credited defendants' explanation, finding that N.C.'s IEP and BIP adequately addressed behaviors such that a crisis plan was not required to provide N.C. with a FAPE. (R. (DE 50-3) at 289, 318).

In general, "a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i); N.C. Gen. Stat. § 115C-109.6. The IDEA provides an exception to this rule where the hearing officer 1) finds a procedural violation of the IDEA, 2) that meets one of the statutory criteria under 20 U.S.C. § 1415(f)(3)(E)(ii), 3) resulting in a denial of FAPE. R.F. by & through E.F. v. Cecil Cty. Pub. Sch., 919 F.3d 237, 248 (4th Cir. 2019). The pertinent statutory criteria contemplate procedural violations that 1) impeded the child's right to a free appropriate public education; 2) significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of a free appropriate public education to the parents' child; or 3) caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); N.C. Gen. Stat. § 115C-109.8(a). Even if a procedural violation occurs that meets the statutory criteria under § 1415(f)(3)(E)(ii), "[w]ithout finding the denial of a FAPE, a hearing officer may do nothing more than order a school district to comply with the [IDEA's] various procedural requirements." Fry v. Napoleon Cmty. Sch., 137 S. Ct. 743, 754 n.6 (2017); MM ex rel. DM v. Sch. Dist. of Greenville Cty., 303 F.3d 523, 533–34 (4th Cir. 2002) (citing Gadsby v. Grasmick, 109 F.3d 940, 956 (4th Cir.1997); Burke County Bd. of Educ. v. Denton, 895 F.2d 973, 982 (4th Cir.1990)).

In <u>R.F.</u>, the United States Court of Appeals for the Fourth Circuit recently considered whether destruction of student data significantly impeded R.F.'s parents from participating in the IEP process. 919 F.3d at 249. There, the court concluded that, because R.F.'s parents could still view summaries of the data from the teacher's quarterly reports, the parents were not significantly impeded from participation in the IEP decision-making process. <u>Id.</u> at 249–250.

With respect to the John Thomas report, <u>R.F.</u> is analogous to the instant case. Instead of being provided the full John Thomas report, plaintiff was given a condensed version of the report intended to facilitate discussion of the recommendations in the full report. (R. (DE 49-1) at 429–30, 432; R. (DE 49-3) at 159). The condensed report summarizes the recommendations made in the full report. (<u>See</u> R. (DE 49-1) at 433–34, 455; R. (DE 56-10) at 27–30). Moreover, plaintiff provided extensive feedback in 20 IEP meetings over the span of two years, and in the interim she communicated voluminous recommendations for N.C.'s education to school staff. (<u>See</u> R. (DE 50-3) at 283–84, 310–11). Plaintiff's opportunity to participate in the decision-making process was not significantly impeded by defendants' failure to disclose the full Thomas report.

The other statutory criteria for actionable procedural violations do not avail plaintiff either. In <u>DiBuo ex rel. DiBuo v. Bd. of Educ. of Worcester Cty.</u>, the Fourth Circuit found that a refusal to consider private evaluations proffered by a minor's parents did not impede provision of FAPE to a minor where the ALJ found that the student was not actually entitled to the services recommended in the evaluations. 309 F.3d 184, 191 (4th Cir. 2002). Similarly, the court in <u>Tice v. Botetourt Cty. Sch. Bd.</u> found that violations of evaluation time limits were not actionable where there was no detrimental effect on the substance of the IEP. 908 F.2d 1200, 1207 (4th Cir. 1990); <u>see</u> <u>T.B., Jr. by & through T.B., Sr. v. Prince George's Cty. Bd. of Educ.</u>, 897 F.3d 566, 573–74 (4th Cir. 2018) (collecting cases).

The instant case is analogous to DiBuo and Tice. Many of the strategies that Thomas recommended were already in place at the time that he observed N.C. (R. (DE 49-1) at 442, 448; R. (DE 49-2) at 636). Additional recommendations that he made were generally accepted and incorporated by the IEP team. (R. (DE 49-1) at 451–52, 734–36; R. (DE 49-2) at 637–39; R. (DE 49-3) at 63, 359–61). Defendants did not accept Thomas's recommendation to implement a crisis plan, because felt that the term "crisis" did not describe N.C.'s behavior, and strategies for responding to N.C.'s raised voice or refusal were already contained in his BIP. (R. (DE 49-2) at 639; R. (DE 49-3) at 361). The court defers to the ALJ's and SHRO's respective findings that N.C.'s IEP and BIP adequately addressed behaviors such that a crisis plan was not required to provide N.C. with a FAPE. (R. (DE 50-3) at 289, 318). The court also defers to the extensive findings of the ALJ documenting examples of effective behavioral intervention by defendants. (R. (DE 50-3) at 319–21). The record does not indicate that withholding the full Thomas report from plaintiff impeded N.C.'s right to a free appropriate public education or caused a deprivation of educational benefits.

Because defendants have since corrected their procedural default by providing plaintiff with the full Thomas report, plaintiff is not entitled to any further relief arising from defendants' failure to disclose. See 20 U.S.C. § 1415(f)(3)(E)(iii); N.C. Gen. Stat. § 115C-109.8(b). Therefore, the court grants defendants' motion for judgment on the administrative record as to plaintiff's claims arising from the Thomas report.

        c.      Provision of FAPE

When N.C. began the 2014–15 academic year, his IEP set forth numerous goals related to social skills, communication deficits, and behavior. Each day, N.C. was to be provided specialized education in reading, math, writing, social and emotional skills, and daily living skills. (R. (DE

50-1) at 290–91). The IEP provided for occupational therapy and speech and language services. (R. (DE 50-1) at 291). N.C. participated in general education during lunch, recess, science, social studies, and specials, with extensive accommodations incorporating recommendations by Thomas and Leykum. (R. (DE 49-2) at 758; R. (DE 50-1) at 283–91). N.C. was provided a one-on-one aide throughout the school day. (R. (DE 49-2) at 752). In October 2014, at plaintiff's request, defendants began providing counseling services to assist N.C., where a licensed school counselor met with N.C. at least once a week to assist with social interactions and calming strategies. (R. (DE 49-2) at 861–63, 868–70, 874–75; R. (DE 50-2) at 38).

The special education classroom followed the standard curriculum for third grade, but in in smaller setting and with a focus on learning and practicing appropriate school behaviors. (R. (DE 49-3) at 181–82, 186–87). The classroom held five to seven students, attended by four adults, allowing for significant small group and one-on-one instruction. (R. (DE 49-2) at 752). Instruction in social skills was provided daily, and the classroom also incorporated several different interventions and routines designed to help students feel safe and learn to calm themselves. (R. (DE 49-2) at 754–58; R. (DE 49-3) at 323). N.C.'s teachers were both well credentialed educators licensed to teach special education. (R. (DE 49-2) at 748; R. (DE 49-3) at 68–69, 74). The school also retained a behavior specialist experienced in working with students with autism and behavioral/emotional needs to provide support, training, and recommendations to staff who worked with N.C. (R. (DE 49-3) at 177–80, 228–29).

N.C. also began the 2014–15 school year with a BIP drafted by the IEP team in May 2014. (R. (DE 50-1) at 121–65). Like N.C.'s IEP, the BIP incorporated many of the recommendations of Thomas and Michelle Leykum, another behavioral specialist, as well as strategies requested by plaintiff and her private therapist. (R. (DE 50-3) at 326). On February 3, 2015, the IEP team

updated N.C.'s BIP, maintaining most of the strategies originally added from May 2014. (See R. (DE 50-2) at 287–91). The BIP included numerous strategies for addressing anxiety and fearfulness, including use of sensory items and sensory breaks, positive directions in a calm voice, visual calm down strategies and instruction in how to use them, and use of a calm down area in the classroom. (See R. (DE 50-2) at 271–98).

Testimony from the administrative proceeding below demonstrates that N.C.'s BIP was consistently implemented, including extensive calming routines, strategies, and spaces. (R. (DE 49-2) at 743–45, 754–58, 792–800; R. (DE 49-3) at 28, 79–86, 102–03, 197–200, 273–75, 279; R. (DE 49-4) at 175–83; R. (DE 50-3) at 291, 326–27). In response to plaintiff's concerns, the school's behavior specialist also created an extensive spreadsheet comparing observations of the techniques and interventions she observed in the classroom and the recommendations of outside consultants and therapists, demonstrating that N.C.'s BIP was being properly implemented. (R. (DE 49-3) at 202–05, 263–65; R. (DE 56-2) at 17–18). Daily reports showed that N.C. met behavioral expectations on most days leading up to December 2014. (R. (DE 49-2) at 786–90; R. (DE 55-2) at 146, 147–200; R. (DE 55-3) at 1–28).

Plaintiff had numerous objections to the special education classroom, such as the availability of foods in the classroom that were forbidden to N.C. because of his allergies. (R. (DE 50-1) at 260–64). Beginning on December 9, 2014, plaintiff and N.C.'s father started bringing N.C. to school between 12:00 p.m. and 1:00 p.m. each day to avoid N.C.'s special education classes, believing that doing so relieved N.C.'s anxiety. (R. (DE 49-1) at 390–91, 464; R. (DE 49-2) at 402–04; see R. (DE 50-4) at 180). This decision was made without defendants' agreement. (R. (DE 50-2) at 74–78, 120–23). Unfortunately, plaintiff's decision caused N.C. to miss out on classroom activities including social skills and priming opportunities, leading to behavioral

problems in the later part of the 2014–15 year.  (R. (DE 49-2) at 808–10, 880; R. (DE 49-3) at 64–67, 96–99, 115, 211–17, 231–32, 300).  Contemporaneous daily reports from January to June 2015 indicated that N.C. engaged in various disruptive behavior requiring intervention from teachers and staff.  (See R. (DE 55-3) at 80–100; R. (DE 55-4) at 1–78).  N.C.'s maladaptive behaviors, including yelling, physical aggression, and school avoidance, also occurred in the home and community and ultimately continued after N.C. withdrew from Wake County Public Schools. (See, e.g., R. (DE 49-1) at 35, 480–86; R. (DE 49-4) at 647–68).

"To assure that students with disabilities receive FAPEs, IDEA requires that school districts provide IEPs for each disabled child."  A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 319 (4th Cir. 2004).  "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."  Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, 137 S. Ct. 988, 999 (2017).  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal."  Id. (emphasis in original) (citing Rowley, 458 U.S. at 206–07).  Thus, "whether an educational program offered by the state is appropriate for purposes of the FAPE analysis is a question of fact" that "is . . . grounded in each particular child's circumstances."  R.F., 919 F.3d at 237, 245, 246.

"An IEP must detail the student's current educational status, set forth annual goals for the student's education and state the special educational services and other aids that will be provided to the child as well as the extent to which the child will be mainstreamed."  A.B., 354 F.3d at 319–20.  The IDEA mandates that, in developing the IEP, "[t]he IEP Team shall--in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  20 U.S.C. §

1414(d)(3)(B); 34 C.F.R. § 300.324(a)(2)(i). Though development of a written BIP is an acceptable way of considering a child's behavioral needs, it is not required under the IDEA unless the school imposes certain disciplinary sanctions on a disabled child. 20 U.S.C. § 1415(k)(1)(F); 34 C.F.R. § 300.530(f)(1); R.P. ex rel. R.P. v. Alamo Heights Indep. Sch. Dist., 703 F.3d 801, 813 (5th Cir. 2012); Park Hill Sch. Dist. v. Dass, 655 F.3d 762, 766 (8th Cir. 2011); Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 25 (1st Cir. 2008); Alex R., ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221, 375 F.3d 603, 614–15 (7th Cir. 2004).

When deciding whether a school met its obligation to provide FAPE, the court does not close its eyes to parental conduct that frustrates the ability of a school to meet its statutory obligations. In Denton, the Fourth Circuit refused to hold a school system liable where the parents removed their student from school, undermining the school's ability to comply with the IDEA. 895 F.2d at 982; see also M.M., 303 F.3d at 535 (agreeing with the district court that "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation" (alterations in original)). More recently, the Fourth Circuit found the school system did not substantively violate the IDEA where "the record [was] devoid of any credible evidence that an unaddressed disability caused T.B.'s educational difficulties and replete with credible evidence that T.B. himself was the cause."[6] T.B., 897 F.3d at 578.

The court concludes that N.C. was provided with a FAPE. The IEP and BIP offered for N.C. were both reasonable calculated and appropriately implemented by defendants to allow N.C. made appropriate progress in light of his circumstances. (R. (DE 50-3) at 301, 339). Any lack of educational progress or manifestation of behavioral problems by N.C. during the relevant period

---

[6] The court sees no reason why the holding of T.B. would not also extend to parental conduct that undermines provision of FAPE.

cannot fairly be ascribed to defendants, given plaintiff's willful failure to present N.C. for core specialized academic instruction integral to N.C.'s IEP. (R. (DE 50-3) at 301, 339). Accordingly, the court grants defendants' motion for judgment on the administrative record.

B.      Plaintiff's Motion to Strike (DE 93)

Plaintiff argues that defendants' corrected motion for summary judgment should be struck because the certificates of service attached the motion bear the incorrect date of service, and defendants' memorandum in support fails to conform to the requirements of the court's local rules.

Turning to plaintiff's first argument, the Federal Rules of Civil Procedure require that "if [a] paper is filed, a certificate of service must be filed with it or within a reasonable time after service." Fed. R. Civ. P. 5(d)(1)(B)(i). However, the court is not required to disregard a defective certificate of service "if it finds by other evidence that the paper was in fact served on the parties." Russell v. City of Milwaukee, 338 F.3d 662, 666 (7th Cir. 2003); Bullock v. N. Ins. Co. of New York, 331 F.2d 431, 432 (10th Cir. 1964). "[T]he central issue in determining whether the information was served is whether the information was placed in the mail and not whether [plaintiff] received the information." United States v. Wright, 238 F.3d 418 (4th Cir. 2000) (per curiam).

Here, plaintiff concedes that defendants served their corrected motion for summary judgment and accompanying documents on August 7, 2019. (See August 7, 2019 Email Correspondence (DE 94-3) at 1; Mail Envelope (DE 94-2) at 1). Although the certificates of service appended to the corrected motion for summary judgment and supporting memorandum of law bear the incorrect date of service, plaintiff's own motion demonstrates that the information was timely placed in the mail and she received the information. Since service of the motion was made in this case, plaintiff's first ground for striking defendants' motion is rejected.

As to plaintiff's second argument, the court's local rules provide in part that a memorandum in support shall comply with Local Civil Rule 10.1 and contain 1) a concise summary of the nature of the case; 2) a concise statement of the facts; 3) the argument relating to the matter before the court; and 4) copies of any required unpublished decisions. E.D.N.C. Local Civil Rule 7.2(a). In support of a motion for summary judgment, the court's local rules also provide that a movant must file a statement of material facts with numbered paragraphs detailing each fact. E.D.N.C. Local Civil Rule 56.1(a)(1).

Plaintiff concedes that defendants filed a statement of material facts in compliance with Local Civil Rule 56.1(a)(1). She nonetheless argues that she is confused because the statement of facts in defendants' memorandum of law is unnumbered. The local rules do not require the statement of facts contained in a memorandum of law be numbered, only that they be concise. In the instant case, defendants' statement of facts is five and a half pages and summarizes several different events occurring over a three-year period. Defendants' statement of facts complies with the court's local rules.

Finally, plaintiff argues that defendants' memorandum in support of its corrected motion for summary judgment was not filed contemporaneously with the motion. <u>See</u> E.D.N.C. Local Civil Rule 7.1(e). The court is unpersuaded. The docket, as well as plaintiff's exhibits in support of her motion, clearly indicate the memorandum of law was filed the same day as the motion. Plaintiff's motion to strike is denied.

C.     Defendant's Corrected Motion for Summary Judgment (DE 88)

1.     Statement of Undisputed Facts

As set forth in the court's statement of the case, the parties stipulate that plaintiff initiated and participated in IDEA administrative proceedings for the benefit of N.C. The undisputed facts pertaining to plaintiff's retaliation claims may be summarized as follows.

On October 3, 2013, at around 5:10 p.m., Grant was leaving Lynn Road Elementary School for the day when she saw plaintiff lingering outside the school building. (Grant Aff. ¶ 8). Plaintiff told Grant that she wanted to go in to see N.C.'s teacher, and Grant told plaintiff that N.C.'s teacher had left for the day. (Id.). Plaintiff then started walking beside Grant as Grant walked to her car, attempting to engage in conversation about use of N.C.'s sensory device in the classroom following an incident where N.C. got upset because his teacher told him not to touch a doorknob. (Id.; E. Coleman Aff. ¶¶ 26–28). Grant offered to meet with plaintiff first thing in the morning and attempted to end the conversation. (Grant Aff. ¶ 8; E. Coleman Aff. ¶ 29).

Rather than leaving the premises and meeting with Grant in the morning, plaintiff entered the school building through the gym and tried to access the main building. (Grant Aff. ¶ 9; see E. Coleman Aff. ¶¶ 30, 31). Other teachers had previously reported to Grant that plaintiff was seen lingering outside the school building during the school day, looking in windows, and trying to approach staff when they were trying to leave for the day, making teachers uncomfortable. (Grant Aff. ¶ 10). On October 4, 2013, Grant issued plaintiff a letter stating Grant's expectation that plaintiff not try to enter the building after dismissal. (Id. ¶ 11; Smith Aff. Ex. A).

On or around October 21, 2014, plaintiff took N.C. out of school after a meeting with Heidi Van Brocklin ("Van Brocklin"), Root Elementary School's counselor. (See E. Coleman Aff. ¶¶ 61–65). Later that day, plaintiff called the school to ask if N.C. could return and was given permission to bring N.C. back for science class. (Id. ¶ 66; M. Coleman Aff. ¶ 23). When plaintiff and N.C. arrived at school's front office, the receptionist informed plaintiff that Blaine Clark

("Clark"), principal of Root Elementary School, had changed his mind, and would not allow N.C. to return to science class that day. (E. Coleman Aff. ¶¶ 67–68). After requesting that Clark reconsider his decision, plaintiff entered Clark's office without permission to speak with him. (Id. ¶¶ 69–72; see Smith Aff. ¶ 7, Ex. B).

Clark reported the incident to Smith, claiming that plaintiff repeatedly attempted to enter his office after being told he was unavailable, refused to obey multiple requests to leave the office, and caused a general disruption. (Smith Aff. ¶ 7, Ex. B). Clark also reported that plaintiff was spotted by school staff standing outside the playground watching staff and students during the school day. (Id.; see E. Coleman Aff. ¶ 84). On October 23, 2014, Smith sent plaintiff a letter directing her to sign in at the office on campus and be escorted by school staff to her destination but did not restrict plaintiff's access to campus. (Smith Aff. ¶ 9, Ex. C).

Subsequently, Clark and the special education staff reported that plaintiff violated the guidelines in the October 23, 2014, letter by approaching teachers during the school day without an appointment or invitation and question them. (Id. ¶ 10). On January 6, 2015, plaintiff signed into school, apparently without an escort, and approached N.C.'s teachers about how he was doing in class while en route to the cafeteria. (E. Coleman Aff. ¶¶ 99–101). On January 14, 2015, plaintiff observed a library class while being escorted by Clark, and she left Clark while being escorted off campus to retrieve her glasses from the library and questioned the librarian. (E. Coleman Aff. ¶¶ 110–15). On January 21, 2015, Smith issued a no-trespass letter to plaintiff, restricting her access to campus except for emergencies and to drop off and pick up N.C. (Smith Aff. ¶ 11, Ex. D). N.C.'s father was not restricted from coming on to school campus. (See id.).

During the summer of 2015, plaintiff withdrew N.C. from Wake County Public Schools. (E. Coleman Aff. ¶ 133). On December 6, 2016, Grant informed Smith that plaintiff had come on

to Lynn Road Elementary School on December 1, 2016, and then again on December 5, 2016, each day just before dismissal.  (Smith Aff. ¶ 12, Ex. E; <u>see</u> E. Coleman Aff. ¶¶ 137, 138).  On December 5, 2016, plaintiff took N.C. to the school playground, and Grant told plaintiff that she and N.C. would have to leave because N.C. was no longer an enrolled student.  (E. Coleman Aff. ¶¶ 137, 139).  After a delay, plaintiff and N.C. left the playground.  (E. Coleman Aff. ¶¶ 140–41).  In light of this and prior reports of plaintiff's disruptive behavior, Smith issued a second no-trespass letter on December 12, 2016, prohibiting plaintiff from coming onto any Wake County Public School campus.  (<u>Id.</u> ¶ 13, Ex. F).

Several months later, in August 2017, Smith received an email from Felecia Locklear ("Locklear"), principal of Brooks Elementary School in Raleigh.  (<u>Id.</u> ¶ 15, Ex. G).  Locklear reported that plaintiff had come onto the campus of Brooks Elementary and caused a significant disturbance.  (<u>Id.</u>).  On August 22, 2017, plaintiff brought N.C. to Brooks Nature Trail.  (E. Coleman Aff. ¶ 146).  Upon getting out of the car, N.C. immediately ran towards the school with plaintiff in pursuit.  (<u>Id.</u>).  Staff told plaintiff and N.C. that the school was not open to the public that day.  (<u>Id.</u> ¶ 148).  Plaintiff intended to leave at that point, but N.C. ran around the school and plaintiff was unable to catch him.  (<u>Id.</u>).  Locklear did not greet N.C. in a friendly manner upon discovering he was on campus, and N.C. hit her.  (<u>Id.</u> ¶ 152).  The pursuit continued until plaintiff was able to convince N.C. to leave the school.  (<u>Id.</u> ¶¶ 153, 154).

Because school officials determined that was no reason for plaintiff to be on Brooks Elementary campus, and because of the outstanding no-trespass letter for plaintiff from December 2016, defendants reported to the local sheriff's department that plaintiff had trespassed on school property in violation of restrictions placed upon her by defendants.  (Smith Aff. ¶ 16).  It was reported to Smith that plaintiff was arrested.  (<u>Id.</u>).

2.      Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).  Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."  Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).  By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.  Id. at 489–90.

3.     Analysis

a.     Statute of Limitations

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203.  The Rehabilitation Act incorporates the same anti-retaliation provision by reference.  29 U.S.C. § 794(d).

Because the ADA and Rehabilitation Act's anti-retaliation provisions were enacted prior to December 1, 1990, and because the neither statute set a limitations period, the court must "borrow the state statute of limitations that applies to the most analogous state-law claim."  A Soc'y Without A Name v. Virginia, 655 F.3d 342, 347 (4th Cir. 2011); see 28 U.S.C. § 1658.  The most analogous North Carolina law is the North Carolina Persons with Disabilities Protection Act, which prohibits disability discrimination in public accommodations, services, and transportation.  See N.C. Gen. Stat. §§ 168A–1 et seq.; McCullough v. Branch Banking & Trust Co., 35 F.3d 127,

130 (4th Cir. 1994). The applicable statute of limitations for non-employment claims under this North Carolina law is two years. N.C. Gen. Stat. § 168A–12.

Plaintiff filed her motion to proceed in forma pauperis on June 16, 2017, tolling the statute of limitations until her motion was granted. See, e.g., Escobedo v. Applebees, 787 F.3d 1226, 1233 (9th Cir. 2015); Truitt v. Cty. of Wayne, 148 F.3d 644, 647–48 (6th Cir. 1998); Williams-Guice v. Bd. of Educ., 45 F.3d 161, 164–65 (7th Cir. 1995); Jarrett v. U.S. Sprint Commc'ns Co., 22 F.3d 256, 259 (10th Cir. 1994). However, any claims of retaliation prior to June 15, 2015, are barred by the applicable statute of limitations, including but not limited to plaintiff's claims challenging the first no-trespass letter imposed by defendants on January 21, 2015. (See Smith Aff. ¶ 11, Ex. D).

> b. Retaliation Claims

Plaintiff claims that defendants unlawfully retaliated against her because she instituted proceedings under the IDEA for the benefit of N.C. Plaintiff's complaint specifically claims retaliation for 1) removing her and N.C. from the Lynn Road Elementary School playground and issuing a no-trespass letter to plaintiff on December 12, 2016, and 2) arresting her on August 29, 2017, for violating the no-trespass letter.[7]

The anti-retaliation provisions of the ADA and Rehabilitation Act are interpreted consistently with Title VII. See, e.g., Hooven-Lewis v. Caldera, 249 F.3d 259, 272 (4th Cir. 2001); Rhoads v. F.D.I.C., 257 F.3d 373, 392 (4th Cir. 2001). Absent direct evidence of retaliation, a prima facie case requires plaintiff to show "(1) that [s]he engaged in protected activity, (2) that the [defendant] took an adverse action against [her], and (3) that the adverse action was causally

---

[7]     Where plaintiff has not sought leave to amend her complaint and has not demonstrated good cause for allowing any further amendment, the court only addresses the acts of retaliation claimed in the second amended complaint.

connected to [her] protected activity." S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cty., 819 F.3d 69, 78 (4th Cir. 2016).

Plaintiff "may establish prima facie causation simply by showing that (1) [defendants] either understood or should have understood [plaintiff] to be engaged in protected activity and (2) [defendants] took adverse action against [plaintiff] soon after becoming aware of such activity." Strothers v. City of Laurel, Maryland, 895 F.3d 317, 335–36 (4th Cir. 2018) (internal citation omitted). The "temporal proximity must be very close." See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (per curiam); King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding two and a half months sufficiently long so as to weaken significantly an inference of causation, but enough to make a prima facie case where employment decisions would likely be made at the end of a school year); Williams v. Cerberonics, Inc., 871 F.2d 452, 454, 457 (4th Cir. 1989) (finding plaintiff proved prima facie causation where three and a half months elapsed between the protected activity and the adverse employment action).

If plaintiff makes a prima facie case of retaliation, the burden shifts to defendants "to rebut the presumption of retaliation by articulating a legitimate nonretaliatory reason for its actions." Holland v. Washington Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007).

If defendants provide evidence of a legitimate nonretaliatory reason for their actions, then the burden shifts back to plaintiff to "demonstrate that the proffered reason is a pretext for forbidden retaliation." S.B., 819 F.3d at 78. "[I]t is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the adverse action. Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000). Plaintiff's burden is to prove "that the unlawful retaliation would not have occurred in the absence of" plaintiff's protected activity. Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013).

Defendants concede for purposes of the motion that filing a petition under the IDEA and filing a subsequent lawsuit in federal court are protected activities. (Def. Mem. (DE 91) at 10). They also concede for purposes of the motion that they took steps to restrict plaintiff's access to defendants' properties and reported her to law enforcement when she ignored those restrictions. (Def. Mem. (DE 91) at 10–11).

Turning first to plaintiff's claim that defendants had plaintiff arrested on August 29, 2017, in retaliation for instituting IDEA proceedings, plaintiff fails to make a prima facie case of retaliation. Defendants were served the SHRO's decision finding for them on all issues on April 5, 2017. (R. (DE 50-3) at 303). Plaintiff was not arrested until over four and a half months later, making the temporal proximity between the arrest and the conclusion of the IDEA administrative proceedings not "very close." In addition, plaintiff fails to offer any evidence that defendants had notice of her federal IDEA action until August 31, 2017, two days after plaintiff's arrest. (See Def. Mem. (DE 91) at 12). Plaintiff does not dispute that she came on to Clark Elementary School property when there was a no-trespass letter in place on August 22, 2017, forbidding her from being on Wake County Public Schools property. (See Smith Aff. ¶¶ 15, 16, Ex. G; E. Coleman Aff. ¶¶ 146–54). Therefore, plaintiff does not make a prima facie case that her arrest was retaliatory due to enforcement of the no-trespass letter.

However, the court reaches a different conclusion as to whether issuing the December 12, 2016, no-trespass letter in the first place was retaliatory. At the time Smith issued the December 12, 2016 no-trespass letter banning plaintiff from entering any school property, he "was aware that [plaintiff] had engaged in some legal action against [defendants]." (Smith Aff. ¶ 14). Wilson, who initially took the information from Grant regarding plaintiff's incursion on to Lynn Road Elementary School's playground, noted the legal action on the form. (Id.). Defendants should

have understood plaintiff was engaged in protected activity. The record also indicates that plaintiff's participation in the administrative hearings on her due process claims took place as late as October 2016. (See R. (DE 50-3) at 304). Therefore, the court infers that plaintiff has made a prima facie case of retaliation for issuance of the December 12, 2016, no-trespass letter.

Defendants offer legitimate, nonretaliatory reasons for their actions. "School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property." Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir. 1999). Smith testified that he issued the December 12, 2016, no-trespass letter "solely because [plaintiff] had a long history of disruptive behavior on our campuses, and I know from experience she would not recognize generally applicable visitor rules or the authority of principals on our campuses." (Smith Aff. ¶ 14).

Though plaintiff disputes the details of certain of her encounters with Wake County Public Schools, plaintiff does not raise any genuine issue of material fact demonstrating that defendants' reasons for issuing the December 12, 2016, no trespass letter are pretextual. It is undisputed that plaintiff was warned regarding school expectations for visitors after accosting Grant in the Lynn Road Elementary School parking lot, then entering the school after hours because she was not satisfied with having a conversation with Grant the following morning. (Grant Aff. ¶¶ 8, 9; Smith Aff. ¶ 5, Ex. A; see E. Coleman Aff. ¶¶ 26–28, 30, 31). Despite being told Clark was not available while waiting in the front office, plaintiff nonetheless entered Clark's office. (E. Coleman Aff. ¶¶ 69–72; see Smith Aff. ¶ 7, Ex. B). It is also undisputed that plaintiff was spotted by school staff standing outside the playground watching staff and students during the school day. (Smith Aff. ¶ 7, Ex. B; see E. Coleman Aff. ¶ 84).

On October 23, 2014, Smith sent plaintiff a letter directing her to sign in at the office on campus and be escorted by school staff to her destination but did not restrict plaintiff's access to campus. (Smith ¶ 9, Ex. C). Subsequently, Clark and the special education staff reported that plaintiff violated these guidelines in the October 23, 2014. (Id. ¶ 10; see E. Coleman Aff. ¶¶ 99–101, 110–15). Due to plaintiff's failure to follow school policies and directives from school principals, Smith issued the first no-trespass letter to plaintiff on January 21, 2015, restricting her access to campus except for emergencies and to drop off and pick up N.C. from school. (Smith Aff. ¶ 11, Ex. D).

In spite of this no-trespass letter, Grant informed Smith that plaintiff had come on to Lynn Road Elementary School on December 1, 2016, and then again on December 5, 2016, each day just before dismissal. (Smith Aff. ¶ 12, Ex. E; see E. Coleman Aff. ¶¶ 137, 138). On December 5, 2016, plaintiff was taking N.C. to the school playground, and Grant told plaintiff that she and N.C. would have to leave because N.C. was no longer an enrolled student. (E. Coleman Aff. ¶¶ 137, 139). After a delay, plaintiff and N.C. left the playground. (E. Coleman Aff. ¶¶ 140–41).

The essence of plaintiff's pretext argument is that the events supporting the decisions to restrict her access to campus were not truly disruptive. As the court notes above, "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason" for the adverse action. Hawkins, 203 F.3d at 279. The undisputed facts clearly indicate that defendants placed access restrictions on plaintiff, and had her arrested for violating those restrictions, based on the events described above. While plaintiff may contest the exact manner in which certain exchanges occurred, there is no genuine issue of fact that these events were the basis for the no-trespass letter, not plaintiff's engagement in IDEA proceedings.

Defendants' corrected motion for summary judgment is granted.

## CONCLUSION

Based on the foregoing, defendants' motion for judgment on the administrative record (DE 78) is GRANTED. Defendants' corrected motion for summary judgment (DE 88) is GRANTED. Plaintiff's motion to strike (DE 93) is DENIED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 3rd day of February, 2020.

LOUISE W. FLANAGAN
United States District Judge